# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**KEARNEY CONSTRUCTION COMPANY LLC,**

        **Plaintiff,**

**v.**                                                    **Case No. 8:09-cv-1850-T-30TBM**

**TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA,**

        **Defendant/Third Party Plaintiff,**

**v.**

**KEARNEY CONSTRUCTION COMPANY, LLC, et. al,**

        **Third Party Defendants.**
_____/

**TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA,**

        **Plaintiff,**

**v.**

**FTBB, LLC,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION
## IN PROCEEDINGS SUPPLEMENTARY

THIS CAUSE is before the Court for a Report and Recommendation following the final evidentiary hearing in these proceedings supplementary, which was conducted October 3–4, 2016. Following the final hearing, at the Court's request, the parties submitted post-hearing briefs. (*See* Docs. 813 and 814).

## I.

As previously detailed by this Court, the current proceedings supplementary derive from circumstances and events in two contentious post-judgment proceedings—the instant underlying action (the "Travelers case"), as well as a separate action in this District before the Honorable Elizabeth A. Kovachevich, Case No. 8:09-cv-1841-T-17MAP (the "Regions case"). Each action resulted in a significant judgment against Bing Charles W. Kearney, Jr. ("Mr. Kearney" or "Bing Kearney") and others, which in turn resulted in competing creditors attempting to collect upon their respective judgments.

These proceedings supplementary pit Travelers Casualty & Surety Company of America ("Travelers") against FTBB, LLC ("FTBB"). By reason of a settlement reached by Mr. Kearney in the Regions case, which resulted in the sale and assignment of that judgment, FTBB now claims to own the judgment entered in the Regions case and to have priority over Travelers with respect to the garnished funds at USAmeriBank. Travelers disputes FTBB's legitimacy as a judgment-creditor and seeks to void the transfer and assignment of the Regions judgment or to subordinate FTBB's claims to the funds.

The parties agree on certain facts, which largely relate to the procedural background of this action and the Regions case. (*See* Doc. 780). A brief procedural review follows.

In this case, on October 28, 2011, the Court entered Judgment in favor of Travelers and against Mr. Kearney and others in the amount of $3,750,000.00. (Doc. 244; Jt. Ex. 5). Despite its efforts to date to collect on the Judgment from Mr. Kearney, Travelers has been unable to do so.

2

In the Regions case, on September 28, 2012, Regions Bank obtained a judgment against Mr. Kearney in the amount of $3,407,620.35.  (*See* Regions case, Doc. 177; Jt. Ex. 12).  The Regions judgment included joint and several liability against Tracey J. Harris Jr. and Brian Seeger in the amount of $638,968.75.  *Id.*  Regions also made considerable effort to collect upon its judgment.  Pertinent here, on May 17, 2013, in an effort to collect on its judgment, Regions served a writ of garnishment on USAmeriBank, which in turn answered that it was indebted to Mr. Kearney in the amount of $700,022.29.[1]  (*See* Regions case, Docs. 206, 212; Jt. Exs. 13, 15).

In aid of its collection efforts, Travelers has attempted to garnish several bank accounts, including Mr. Kearney's accounts at USAmeriBank.  Travelers first requested a writ of garnishment directed to USAmeriBank on August 26, 2014, which this Court granted on September 9, 2014.  (Docs. 272, 274).  Mr. Kearney and certain of his family members opposed the garnishment, and for a variety of reasons, including repeated requests for continuances, no judicial resolution or final judgment in garnishment was reached on this first writ.  (*See, e.g.,* Docs. 407, 422, 430, 431, 512, 514).

While litigation was ongoing as to Travelers' first writ to USAmeriBank, in April 2015 Mr. Kearney and Regions reached a global settlement of a number of claims, including Regions' $3,407,620.35 judgment against Mr. Kearney.  (Jt. Ex. 30).  Among other provisions, Regions agreed to sell and assign its judgment to FTBB.  In connection with the settlement, Regions and FTBB executed a Confidential Judgment Purchase and Sale Agreement for the purchase price

---

[1]The accounts later identified by USAmeriBank (Regions case, Doc. 484) are the same as the accounts identified in answer to Travelers' writ, with the exception of an IRA account listed in the answer to Travelers' writ which was (apparently inadvertently) not listed in the answer to the Regions writ.

of $2,625,000.00 (Jt. Ex. 33), and Regions executed an Assignment of Judgment to FTBB (Jt. Ex. 34).

As provided for in the settlement agreement, on May 1, 2015, Regions, Mr. Kearney, his wife Tonya Kearney, sons Charles Wesley Kearney, III, and Clayton Whitman Kearney, along with his brother Bryan G. Kearney, filed a Stipulation in the Regions case to grant Regions' pending Motion for Final Summary Judgment in Garnishment agreeing to waive all challenges and to entry of a final judgment in garnishment. (Regions case, Doc. 538; Jt. Ex. 30 at Ex. A). Four days later, on May 5, 2015, FTBB was substituted as party-plaintiff in place of Regions. (*See* Regions case, Doc. 545). On May 22, 2015, FTBB filed its own motion for final summary judgment in garnishment relying on the prior stipulation to Regions' motion for summary judgment in garnishment. (Regions case, Doc. 561). That motion remains pending before Judge Kovachevich.[2]

On June 1, 2015, in an attempt to challenge FTBB's claim to the garnished accounts at USAmeriBank, Travelers moved for proceedings supplementary in this action and to implead FTBB. (Doc. 526). The Court granted the motion. (Doc. 533).

On July 23, 2015, on Travelers' motion in this case, a second writ of garnishment directed to USAmeriBank issued. (Doc. 556; Jt. Ex. 49). USAmeriBank answered the writ declaring it was indebted to Kearney in the total amount of $1,158,037.38. (Doc. 577; Jt. Ex. 50). As outlined in the undersigned's previous Report and Recommendation (Doc. 711), considerable litigation ensued related to this second writ, with Bing Kearney, certain Kearney family members,

---

[2]In the Regions case, Judge Kovachevich has stayed the proceedings related to the USAmeriBank garnishment pending resolution of the proceedings supplementary in the instant case. (Regions case, Docs. 576, 583, and 586).

FTBB, and Moose Investments of Tampa Bay all seeking to dissolve the writ. Among the grounds for the motions was the claim that FTBB had priority to the USAmeriBank garnished funds by reason of its purchase and the assignment of the Regions judgment. Travelers' second writ to USAmeriBank remains outstanding, pending resolution of several matters, including an appeal to the Eleventh Circuit and the instant supplementary dispute.

On August 25, 2015, in furtherance of the proceedings supplementary, Travelers filed an Amended Complaint in Execution of Judgment to Determine Priority of Claims, to Void Transfer or Assignment of Judgment, for Equitable Subordination and for Other Relief Against FTBB, LLC, pursuant to Florida Statutes § 56.29 and Other Applicable Law. (Doc. 591). Travelers asserted three counts captioned as follows:

> (1) The Kearney-Regions settlement agreement released the claims allegedly assigned to FTBB, including the Regions garnishment and, therefore, FTBB does not have priority over any claim by Travelers, including claims to the USAmeriBank garnished accounts;
>
> (2) The alleged assignment to FTBB should be set aside or disregarded as a fraudulent or collusive transaction or a sham; and
>
> (3) The alleged assignment to FTBB should be equitably subordinated to Travelers' judgment and rights, including Travelers' garnishment of the USAmeriBank accounts.

*Id.*

On July 15, 2016, the district court granted summary judgment as to Count I in favor of FTBB. (Doc. 756). As a result, only Counts II and III of Travelers' Amended Complaint in Execution remain for disposition.

In Count II, Travelers asserts that FTBB's purchase of the Regions judgment is fraudulent, the product of collusion and a sham. It alleges that Mr. Kearney and his son are

5

attempting to use the alleged assignment of Regions' judgment as a blocking action to prevent Travelers from collecting against Mr. Kearney's assets.  Travelers asserts that a judgment debtor cannot avoid a legitimate creditor's claim by entering into transactions with insiders to give them a superior lien to a non-insider judgment creditor's interest in assets of the judgment debtor.  It seeks to have the assignment set aside or disregarded as a fraudulent or collusive transaction or a sham.  (Doc. 591 at 15-16).

As an alternative remedy, in Count III, Travelers asks that any interest that FTBB may claim in the Regions judgment, including the USAmeriBank garnished accounts, be equitably subordinated to Travelers' interest.  (Doc. 591 at 16-18).

FTBB filed its Answer and Affirmative Defenses to the Amended Complaint on September 8, 2015, denying the allegations of fraud and collusion and asserting various affirmative defenses.  (Doc. 600).

## II.

A final evidentiary hearing on Counts II and III was held October 3–4, 2016.

Witnesses at the evidentiary hearing were: Bing Kearney; Kearney family advisor, James M. Reed; Kearney's son Clayton Kearney; Regions Bank attorney John A. Anthony, Esq.; Travelers' corporate representative Timothy G. Snyder; Kearney's mediation counsel Michael Addison, Esq.; and Justin Rowlson, the CPA for the Kearney family and Kearney family companies, including FTBB and Moose.

The parties presented fifty-one joint exhibits.  (Doc. 793).  Travelers presented two additional exhibits (Doc. 794) and FTBB one additional exhibit (Doc. 795).

## A.

In addition to the procedural background summarized above, the evidence presented establishes the following.

Moose Investments of Tampa Bay, LLC ("Moose"), was formed in December 2007. (Jt. Exs. 1, 2). The company was formed ostensibly to handle investment of funds received by Clayton Kearney in settlement of claims arising from a motor vehicle accident. (*See* Doc. 798 at 81-82; Doc. 799 at 61).[3] Moose has no formal office but keeps its books and records at the offices maintained by several Kearney companies and shares its bookkeeper with other Kearney-owned companies. (Doc. 798 at 102-103). Clayton is the sole owner of Moose. (Doc. 799 at 61). Bing Kearney was originally co-manager of Moose (Jt. Ex. 1), but bowed out in or about August 2012 (Jt. Ex. 11).

On the record presented, Mr. Kearney has made no significant capital contribution to Moose. (Doc. 798 at 82, 138; Trav. Ex. 2 at ¶ 7).[4] Records show that in or about March 2012, while he was still a manager, Moose granted Bing Kearney a revolving line of credit in the amount of $5 million, bearing interest at 3 percent per annum. (Jt. Ex. 6). The line of credit is secured by a promissory note and security agreement from Bing Kearney. (Jt. Ex. 7). Moose also filed a UCC-1 against Mr. Kearney's assets on August 12, 2012. (Jt. Ex. 10).

---

[3]It appears Clayton Kearney suffered a traumatic brain injury in a motor vehicle accident in 2002. As described by his father and James Reed, the injury affects his short-term memory. (Doc. 798 at 39-40, 80-81, 105). Clayton received in excess of $11 million in settlements of this accident. At least some of these monies were used to fund Moose and its investments.

[4]Kearney admits to paying $139.00 for an annual corporate renewal fee in 2009, but otherwise asserts that he has not contributed any funds to Moose. (Trav. Ex. 2 at ¶ 7).

Bing Kearney used the line of credit freely. (*See* FTBB Ex. 1). Evidence also reveals Bing Kearney on occasion wrote checks directly from Clayton's account and from the Moose account. (*See, e.g.,* Jt. Ex. 9, a check for $500,000.00 drawn on Clayton's personal account used to pay his Bing Kearney's father's estate tax; Jt. Ex. 39, a check signed by Bing Kearney on the Moose account).[5] While Mr. Kearney is no longer a manager of the company, the record reveals he maintains considerable involvement over his son's financial activities. For instance, Mr. Kearney continues to monitor the checks written by Clayton. (Doc. 798 at 106-07).

FTBB, a Delaware limited liability company, was a "shelf" company formed in January 2011 by Bing Kearney's former counsel. (Jt. Ex. 3; Doc. 798 at 110-11). The company was only "activated" after James Reed suggested to Bing Kearney that the company could be used as the purchaser/assignee of the Regions judgment.[6] Thus, on April 9, 2015, shortly before the effective date of the Regions settlement, Mr. Reed completed paperwork to activate FTBB, and Clayton Kearney, on behalf of Moose, executed FTBB's Operating Agreement. (Jt. Ex. 29; Doc. 798 at 45-46). FTBB is wholly owned and managed by Clayton Kearney's company, Moose.

FTBB maintained no bank account. (Doc. 798 at 44-45). It has no active purpose apart from being the purchaser and assignee of the Regions judgment. (*See* Doc. 798 at 27-28). FTBB

---

[5]According to Mr. Kearney, he has taken his name off his son's personal account and the bank should not have honored the Moose check because he was not a signatory on that account. (Doc. 798 at 107-08).

[6]Mr. Reed testified that Bing Kearney advised him that he had negotiated a deal with Regions and that Clayton had agreed to buy the judgment. Bing Kearney asked him what vehicle they had in place that would be the best vehicle to use for the deal; Mr. Reed suggested FTBB. (Doc. 798 at 43-44).
According to Bing Kearney, either he or Mr. Reed made the decision to have Moose become the manager of FTBB. (Doc. 798 at 117).

itself did not directly pay any monies to consummate the Regions judgment purchase; Moose funded the purchase. (Doc. 798 at 51).[7]  Since its purchase of the Regions judgment, other than attempting to complete the USAmeriBank garnishment and requesting a fact information sheet from the judgment debtors, FTBB has taken no steps to collect from Bing Kearney or from the other two debtors. (Doc. 798 at 58-60). It does assert priority over Travelers in the pending garnishment proceedings in both this case and the Regions case.

James Reed has been a trusted advisor of the Kearney family for many years and provides services to many companies in which Bing Kearney has an interest. (Doc. 798 at 27-33). Mr. Reed appears the principal advisor to both Clayton Kearney and Moose, and, to say the least, he holds considerable sway over Clayton Kearney's and Moose's business activities, as well as FTBB's. *Id.* He is a manager of Moose (Doc. 798 at 32; *see also* Jt. Ex. 31) and claims to have principal responsibility for the daily management of FTBB (Doc. 798 at 27).

In contrast, Clayton Kearney demonstrates little to no understanding or recollection of Moose's business activities. In particular, he demonstrates no real understanding or recollection of the Regions settlement or the resulting purchase and assignment transactions. Nor could he explain what FTBB does or why FTBB purchased the Regions Judgment. Clayton was also uncertain about any arrangements with his father regarding lending him money. Indeed, in his

---

[7]As discussed below, the monies used to purchase the Regions judgment were paid out of Moose's account. Moose treated the payment as a capital contribution to FTBB (Doc. 798 at 51), although no monies ever went directly to or through FTBB.

testimony, he deferred to Mr. Reed for any explanation of the business activities of Moose and FTBB.[8]  (*See* Doc. 799 at 58-70).

The evidence reveals that on or about March 17, 2015, Bing Kearney paid $3.5 million to Moose purportedly in repayment on his line of credit.  (Jt. Ex. 25; FTBB Ex. 1).  The monies came from the cash surrender value on a Mass Mutual life insurance policy owned by Bing Kearney.  *Id*.[9]  Mr. Kearney testified the payments were made to pay down his debt on the line of credit and had nothing to do with the Regions settlement.  (Doc. 798 at 115-16, 150-52).  He testified that the use of these funds made good business sense because he was earning interest on them at a rate higher than the loan cost him and paying down the Moose line of credit made better sense than paying Regions because of the higher rate of interest charged by Moose.  (Doc. 798 at 145).

The Regions mediation began on or about March 27, 2015, and occurred over several meetings.  (Doc. 799 at 7, 36).

The testimony was that neither Moose nor FTBB was a participant in the mediation. (Doc. 798 at 48).  And, neither Moose nor FTBB had any role in negotiating the purchase price of the Regions judgment.  (Doc. 798 at 48-50).  Regions' attorney testified that Regions had no negotiations with either FTBB or Moose.  (Doc. 799 at 56).  However, on or about April 8, 2015,

---

[8]On the other hand, Clayton testified he was working as a firearms salesman at Shooter's World, and he evidenced considerable technical understanding of helicopters and brands of firearms.  (Doc. 799 at 59-60, 70-73).

[9]According to FTBB records, another check from Mass Mutual in the amount of $552,392.37 was deposited into Moose's account May 7, 2015.  (FTBB Ex. 1; *see also* Jt. Ex. 42).  As of June 3, 2015, Kearney's balance on the line of credit was $384,742.26.  (FTBB Ex. 1).

Moose wire-transferred $2.625 million to the mediator's trust account. (Jt Ex. 27). The following day, on April 9, 2015, Clayton Kearney, on behalf of Moose, executed the Operating Agreement for FTBB prepared by Mr. Reed. (Jt Ex. 29).

Negotiations within the Regions case ultimately led to a written Mediation Settlement Agreement among Mr. Kearney, his wife, and Regions with an effective date of April 21, 2015. (Jt. Ex. 30). The Mediation Settlement Agreement, among other provisions, resolved claims in several cases and provided that the Kearneys stipulate to final judgment in the USAmeriBank garnishment in the Regions case. (*Id.* at ¶ II.4 and Ex. A.) On the same date, James Reed became a manager of Moose. (Jt. Ex. 31).

While Mr. Kearney professes poor memory of the mediation, he does claim that after negotiating the settlement he went looking for a buyer of the Regions judgment, Clayton Kearney agreed to be the purchaser, and Mr. Reed suggested FTBB as a vehicle to accomplish this. He denies the use of FTBB in the settlement had anything to do with hindering Travelers' collections efforts.

On or about April 22 and 23, 2015, Regions and FTBB executed the Confidential Judgment Purchase and Sale Agreement. (Jt. Ex. 33). In conjunction with that agreement, Regions executed an Assignment of Judgment to FTBB. (Jt. Ex 34). By the terms of the purchase and sale agreement, Regions sought to sell and FTBB sought to buy all right, title, and interest in the Regions judgment, including Regions' "position" in the Regions case (and in a separate uniform fraudulent transfer action against Mr. Kearney and his wife). The agreement contemplated the sale and transfer of the Regions judgment, and by separate document, an assignment of judgment to FTBB, which assigned Regions' right, title, and interest in the two

11

proceedings.  The purchase and sale agreement also called for Regions to transfer to FTBB all documents received from the Kearneys in connection with its collection efforts and for Regions to execute an affidavit that it has turned over all "execution-related documents" and destroyed all copies.  (Jt. Ex 33 at ¶ 4(d)).

Mr. Kearney and Mr. Reed testified that they believe the purchase and assignment of the Regions judgment was a good investment for Moose given the discounted price, the potential for an immediate recoupment of approximately $700,000.00 in funds held at USAmeriBank, the likelihood of recovering from the three debtors on the judgment, and because it gave greater protection to Moose in relation to the UCC-1 filing against Mr. Kearney's assets.  (*See* Doc. 798 at 58-59, 89-90, 116, 143).

Post-settlement, on April 28, 2015, Mr. Kearney instructed FTBB's attorney, Frank Miranda, not make any commitments on behalf of FTBB until he talked with Mr. Kearney's attorney, William Collins.   (Jt. Ex. 35).   And, after the purchase and assignment was consummated, all Regions' documents related to Bing Kearney and his wife, were delivered to counsel for Bing Kearney.  Although the Purchase and Sale Agreement required Regions to transfer to FTBB "all documents received from Mr. and/or Mrs. Kearney in connection with judgment collection efforts" (Jt. Ex. 33 at ¶ 4(d)), the documents—which conceivably could have aided FTBB in its collections efforts—were delivered to Mr. Kearney's attorney "at [his] request as representative of FTBB, LLC."  (Jt. Ex. 43).  Counsel for FTTB, Frank Miranda, was copied on the correspondence but "w/o enclosures."  *Id.*

Following the assignment, FTBB moved quickly to be substituted as party-plaintiff in the Regions case.  (Regions case, Doc. 545).  Once substituted, FTBB moved for entry of final

summary judgment on the writ of garnishment to USAmeriBank, relying on the Kearney family members' stipulation to the final judgment.  (Regions case, Doc. 561).

Mr. Reed testified that FTBB did make a small recoupment in garnishment from Platinum Bank totaling about $10,000 (Doc. 798 at 76, 92-93),[10] but has made no attempt to collect as against Bing Kearney or the other debtors of the Regions judgment.  Mr. Reed testified that the check from Platinum Bank has not been deposited and was, at the time of the evidentiary hearing, sitting on his desk.  (Doc. 798 at 98).

FTBB also substituted as party-plaintiff and then dismissed a separate, disputed fraudulent transfer action brought by Regions against Bing Kearney and his wife.  (*See* Case No. 8:13-cv-2627-T-23TBM, Docs. 209, 219, 221; Jt. Ex. 46).  Mr. Reed testified that he was the principal person to decide to settle the fraudulent transfer suit pending against Mr. and Mrs. Kearney because, in his view, the case was significantly over-valued and FTBB did not have an expert witness.  (Doc. 798 at 93-94).[11]

## B.

In its post-hearing brief (Doc. 813), Travelers argues that the evidence and testimony presented show that Bing Kearney orchestrated FTBB's sham acquisition of the Regions judgment.  It urges the fraudulent, sham transaction was concocted to give an insider company,

---

[10]This recoupment appears the result of an order entered in the Regions case prior to FTBB's substitution as plaintiff therein.  On May 4, 2015, Judge Kovachevich granted the joint motion for summary judgment and directed Platinum Bank to pay $13,515.45 to counsel of record for Regions Bank.  (Regions case, Doc. 543).

[11]In connection with the settlement of that fraudulent transfer action, FTBB paid Tonya Kearney $50,000, which was "in part, for reimbursement of any costs and expenses she may have had in respect to the litigation."  (Doc. 798 at 72; *see also* Jt. Ex. 47).  According to Mr. Reed, the $50,000 payment, made by Moose, was treated as a re-payment credit on Mrs. Kearney's line of credit with Moose.  *Id.* at 72-74.

FTBB, priority over Travelers in the garnishment of USAmeriBank-held funds. Travelers argues that the funds used for FTBB's purchase and assignment were actually Mr. Kearney's money and, had this simply been about getting rid of the Regions judgment, Mr. Kearney could have used the cash value in his life insurance to pay off the Regions debt directly without injecting a third-party buyer into the scheme. Now, by reason of this scheme, it claims Mr. Kearney is left liable on a judgment that he effectively controls and FTBB claims a priority position that blocks Travelers from garnishing Mr. Kearney's funds at USAmeriBank.

Travelers rejects FTBB's argument that it cannot establish requisite harm or injury in this purchase and assignment to warrant any relief. Travelers argues it has established by a preponderance of the evidence each of the elements of a fraudulent transfer claim under Florida Statutes Chapter 726 and § 56.29.[12] By Travelers' argument, the statutory scheme does not require a showing of harm or injury and here the evidence otherwise clearly establishes Mr. Kearney contrived and orchestrated the purchase and assignment with the intention of hindering, delaying, or defrauding Travelers. And, if Mr. Kearney had settled all claims with Regions using his own funds, Travelers could have effectively pursued its garnishment of the USAmeriBank accounts.

Travelers sets out proposed findings of fact and conclusions of law whereby it contends that the statutory badges of fraud, such as whether the transfer was made to an insider and whether the debtor maintained possession or control of the property transferred, as well as the totality of circumstances surrounding the purchase and assignment of the Regions judgment,

---

[12]Travelers states that to establish a fraudulent conveyance under Florida law, it must demonstrate that there was (1) a creditor to be defrauded; (2) a debtor intending fraud; and (3) conveyance of property that could have been applicable to payment of the debt due. *See In re PSI Indus., Inc.*, 306 B.R. 377, 387 (Bankr. S.D. Fla. 2003).

reflect its fraudulent nature.   By this argument, Travelers asserts that FTBB is clearly an

"insider," given the control Mr. Kearney maintains over FTBB.  Similarly, the facts demonstrate

that Mr. Kearney, the debtor, maintained possession and control over the Regions judgment.  The

judgment was purchased in accordance with Mr. Kearney's scheme, placed in the hands of a

friendly creditor to avoid Travelers and others from reaching the garnished funds.  It maintains

that Mr. Kearney orchestrated and controlled the Regions transaction and continues to exert

significant control over FTBB post-settlement.   In sum, Travelers argues the totality of

circumstances demonstrate Mr. Kearney's intent to hinder, delay, or defraud Travelers through

this conveyance and assignment of the Regions judgment.

As for relief, it urges the Court to void the transfer and assignment of the Regions

judgment or equitably subordinate FTBB's claims to those of Travelers.

In its post-hearing submission (Doc. 814), FTBB sets out its proposed findings of fact and

conclusions of law, whereby it maintains that this settlement was negotiated at arms length and

in good faith with competent counsel for Regions.  Moreover, it asserts that even if Regions had

not settled with Bing Kearney, Regions, not Travelers, had priority over the USAmeriBank funds.

By this argument, Mr. Kearney's use of a third-party purchaser was not intended to place a

friendly creditor in the position of Regions and block efforts by Travelers to collect on its

judgment; rather, his use of the cash value in his life insurance policies to pay down what he

owed on the Moose line of credit was a smart use of his funds.

FTBB argues Travelers cannot prevail under the fraudulent transfer statutes because it

cannot prove a requisite element that the settlement and assignment of the Regions judgment to

FTBB "hindered, delayed, or defrauded" Travelers.  It claims the transaction simply did not

hinder, delay, or defraud Travelers as it is undisputed that Regions' writ gave it first priority to the USAmeriBank funds.[13]  Travelers was and remains in second position on the writ; thus, FTBB urges no harm occurred.

As for Travelers' argument that Mr. Kearney could have simply paid off the Regions debt with his own money in which case Travelers would have been next in line to collect on the USAmeriBank funds, FTBB urges that Mr. Kearney used exempt funds from his life insurance policy and it was within Mr. Kearney's discretion to use those exempt funds as he wished.  And, it submits Mr. Kearney had no obligation to settle with Regions and, in particular, no obligation to structure his settlement with Regions to accommodate Travelers.  FTBB asserts that Travelers' argument that Kearney improperly preferred one creditor, Moose, over another creditor, Regions, by paying down on the line of credit is unsupported by case law, which holds that such preferential transfers are not deemed fraudulent even though they may hinder or delay a non-preferred creditor.

FTBB further contends that it is a bona fide purchaser for value without notice in contemplation of Florida law (Fla. Stat. § 56.29(6)(b)), and thus its purchase is exempt from execution.  It claims it acquired legal title to Regions' judgment and position, for which it paid

---

[13]FTBB also argues that at best Travelers' claim to the USAmeriBank funds by virtue of its first writ was for only $10,000.00.  Regardless of the wording of Travelers' first writ, it remains that Travelers had a judgment-creditor claim up to its Judgment amount of $3.75 million.  Thus, I do not find this argument has any bearing on the instant dispute and do not address the argument further.

fair value, and at the time Travelers did not have any claim or interest, legal or equitable, in the Regions judgment.[14]

As for the relief requested, FTBB argues that the assignment cannot be set aside or disregarded because Regions is not a party to the proceedings supplementary.  It urges that if the court "unwound" the transaction, Regions and FTBB would have to return to their original positions, with Regions to re-pay the $2.625 million and regaining priority position on the writ.  Finally, FTBB argues that equitable subordination is unavailable to Travelers here because Travelers cannot show harm or injury from the settlement and assignment.  In short, it urges that both before and after the assignment, Travelers held an inferior priority position to the Regions writ.

### III.

"The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located...."  Fed. R. Civ. P. 69(a)(1).  Florida Statute § 56.29 provides the procedural mechanism to assist judgment creditors in reaching the assets of judgment debtors, and the Uniform Fraudulent Transfer Act ("UFTA") has codified the law concerning what constitutes a fraudulent transfer.  *Morton v. Cord Realty, Inc.*, 677 So. 2d 1322, 1324 (Fla. Dist. Ct. App. 1996).

In particular, Florida's proceedings supplementary statute provides: "When any gift, transfer, assignment or other conveyance of personal property has been made or contrived by the judgment debtor to delay, hinder, or defraud creditors, the court shall order the gift, transfer,

---

[14]FTBB also claims that to the extent that Travelers is proceeding under an alter ego theory of liability to pierce the corporate veil, such is not pleaded or proven.  I do not read Travelers' argument that broadly, and I do not decide the instant matter on an alter ego theory of liability.

assignment or other conveyance to be void and direct the sheriff to take the property to satisfy the execution." Fla. Stat. § 56.29(6)(b) (2015).[15]   Further, "the court may enter any orders, judgments, or writs required to carry out the purpose of this section, including those orders necessary or proper to subject property or property rights of any judgment debtor to execution, and including entry of money judgments against any impleaded defendant..."  Fla. Stat. § 56.29(9); *see also* Fla. Stat. § 56.29(5).

Whether a defendant's actions are made or contrived to "delay, hinder, or defraud" is determined by reference to Florida's UFTA, set out in Chapter 726.  *See, e.g., Pollizzi v. Paulshock,* 52 So. 3d 786, 789-90 (Fla. Dist. Ct. App. 2010) (upholding judgment in proceeding supplementary where judgment-creditor proved fraudulent transfer under the UFTA); *Mejia v. Ruiz,* 985 So. 2d 1109, 1112 (Fla. Dist. Ct. App. 2008) ("Whether a defendant's actions are made or contrived to 'delay, hinder, or defraud' must be determined with reference to [the UFTA]."); *Nationsbank, N.A. v. Coastal Utils., Inc.,* 814 So. 2d 1227, 1229 (Fla. Dist. Ct. App. 2002) ("In determining whether a transfer to a third party is invalid, as a fraud on creditors, the Uniform Fraudulent Transfer Act (UFTA) applies."); *Morton,* 677 So. 2d at 1324 ("The manner in which a defendant may prove that a transfer was not fraudulent is governed by case law and the UFTA.").

The UFTA states, in pertinent part: "(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer or incurred the obligation:

---

[15]Unless otherwise indicated, citations to the Florida Statutes are to those in effect in 2015, the year the instant dispute was initiated.

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor ...."  Fla. Stat. § 726.105(1).[16]

Given the difficulty of proving actual intent, the UFTA provides certain "badges of fraud" or indicia, which may give rise to a presumption of fraudulent intent.  *See Woodell v. TransFlorida Bank*, 717 So. 2d 108, 109 (Fla. Dist. Ct. App. 1998); *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 152 (Fla. Dist. Ct. App. 1994).  Thus, in determining actual intent [to hinder, delay, or defraud], consideration may be given, among other factors, to whether:

> (a) The transfer or obligation was to an insider.[17]
> (b) The debtor retained possession or control of the property transferred after the transfer.
> (c) The transfer or obligation was disclosed or concealed.
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
> (e) The transfer was of substantially all the debtor's assets.
> (f) The debtor absconded.
> (g) The debtor removed or concealed assets.
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
> (I) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

---

[16]"Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.  Fla. Stat. § 726.102(12).

[17]"Insider" includes:
> If the debtor is an individual:
> 1. A relative of the debtor or of a general partner of the debtor;
> 2. A partnership in which the debtor is a general partner;
> 3. A general partner in a partnership described in subparagraph 2.; or
> 4. A corporation of which the debtor is a director, officer, or person in control....

Fla. Stat. § 726.102(8).

> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105(2).

Consideration may also be given to factors other than those listed. *See In re Miller,* 188 B.R. 302, 305–06 (Bankr. M.D. Fla. 1995). "Courts may take into account the circumstances surrounding the conveyance." *Gen. Elec. Co. v. Chuly Int'l, LLC*, 118 So. 3d 325, 327 (Fla. Dist. Ct. App. 2013) (citation omitted).

These badges of fraud create a prima facie case and raise a rebuttable presumption that the transfer is void. *Id.* at 327 (quoting *Stephens v. Kies Oil Co.*, 386 So. 2d 1289, 1290 (Fla. Dist. Ct. App. 1980); *see also Nationsbank*, 814 So. 2d at 1230. "While a single badge of fraud may amount only to a suspicious circumstance, a combination of badges will justify a finding of fraud." *Mejia*, 985 So. 2d at 1113 (citations omitted). To prove fraud "only a preponderance or greater weight of the evidence is required." *Wieczoreck v. H & H Builders, Inc.,* 475 So. 2d 227, 228 (Fla. 1985) (quoting *Rigot v. Bucci,* 245 So. 2d 51, 53 (Fla. 1971)).

Proceedings supplementary are equitable in nature and should be liberally construed. *Amjad Munim*, 648 So. 2d at 150. Florida courts have consistently held that § 56.29 must be given a liberal construction in order to afford a judgment creditor the most complete relief possible. *See Mejia,* 985 So. 2d at 1112 (quoting *Richard v. McNair*, 164 So. 836, 840 (Fla. 1936); *Gen. Guar. Ins. Co. of Fla. v. DaCosta*, 190 So. 2d 211, 213 (Fla. Dist. Ct. App. 1966)); *Pollizzi*, 52 So. 3d at 789.

## VI.

## A.

It bears noting at the outset that I assign no malfeasance or fraudulent intent to Regions. The global settlement, negotiated and agreed to by Regions, appears an arms-length transaction as pertains to Regions. Simply put, there is no allegation—let alone evidence—of collusion by Regions to defraud, delay, or hinder Mr. Kearney's creditors through this settlement. Except as discussed below, nothing in this Report and Recommendation should be construed to affect Regions' global settlement and release of its judgment.

Rather, upon consideration I find the preponderance of the evidence reveals that Mr. Kearney, with the counsel and assistance of James Reed, concocted and orchestrated a scheme as part of the Kearneys' global settlement with Regions to block Travelers' (and perhaps other creditors) efforts to collect upon his personal property. More particularly, the evidence presented shows that Mr. Kearney designed and intended the purchase and assignment of the Regions judgment by Clayton Kearney's entities to place that judgment in the hands of a friendly creditor and thereby block Travelers from reaching Mr. Kearney's funds at USAmeriBank.

For the reasons set forth below, I conclude that the purchase and assignment of the Regions judgment was made with specific intent to hinder or delay creditors (particularly Travelers) from garnishing the USAmeriBank funds and as a result those entities should be prevented from claiming priority to such funds. Certain facts suggest badges or indicia of fraud, which lead me to this conclusion.

As outlined above, in March 2012 Bing Kearney, while manager of Moose, took out a line of credit giving him unfettered access to $5 million of his son's money. Bing Kearney used his

son's monies via the line of credit freely for his own benefit.  For most of credit line's existence, Mr. Kearney made no effort to repay even the minimal 3% interest owed on the loan, nor did he make any significant contribution toward paying down the principal.[18]  None of the monies available to Bing Kearney were used to pay down the sizable judgments obtained by Travelers and Regions, even after both entities began pursuing aggressive collections activities.

Shortly before settlement negotiations with Regions began, on March 17, 2015, Mr. Kearney paid $3.5 million to Moose.  It is demonstrated (and uncontroverted) that Mr. Kearney actually owed these funds to Moose by virtue of the line of credit.  Travelers has presented no contrary evidence that Mr. Kearney did not in fact owe the money to Moose.  Despite the appearance that Moose used those funds to purchase the Regions judgment, I cannot agree with Travelers' assertion that those funds were any longer Mr. Kearney's.

However, I do find from the whole of the circumstances that the payment of $3.5 million was intended by Mr. Kearney to fund his son's indirect purchase (by Moose through FTBB) of the Regions judgment for Mr. Kearney's own benefit.

First, the timing of Mr. Kearney's payment appears pre-meditated and suspect.  At the time, both Travelers and Regions were aggressively pursuing collection activities, which likely would have resulted in the garnished funds being seized.  I do not think it a coincidence that just ten days prior to Mr. Kearney's payment to Moose Judge Kovachevich found the largest account at USAmeriBank was not tenants-by-the-entireties and therefore not exempt from garnishment.

---

[18]According to records, Mr. Kearney made his first two payments to Moose in September 2014 for $400 and $139,005.64, respectively, but made no other payments until March 2015.  (FTBB Ex. 1).

In fairness, I must point out that the line of credit did not require any interim payments.  All accrued interest and principal are due and payable on the maturity date, February 28, 2017.  (Jt. Ex. 6).

(Jt. Ex. 22, entered March 7, 2015).  At that point, Mr. Kearney was well aware that he stood to lose at least the approximately $625,000 in that account if he did not act quickly to protect those funds from creditors.  The evidence and circumstances presented preponderates that Mr. Kearney set his plan in motion by making payment to Moose with the intent that his son's company would prevent the garnishment of his funds to "unfriendly" hands.

Further, the payment made by Mr. Kearney appears a necessary predicate to Moose paying the $2.625 million purchase price on behalf of FTBB.  FTBB, which was activated one day after Moose's transmittal of the funds to the mediator, had no funds, no active purpose, and had never before purchased any judgment (or anything else) for investment purposes.  Moose, for its part, is apparently funded by Clayton Kearney's direct capital contributions.[19]  In this instance, however, Moose received a capital injection from Bing Kearney's re-payment on March 17, 2015, and thus was flush with funds and able to make the wire-transfer to the mediator on April 8, 2015.  Again, I do not find this mere coincidence.

Mr. Kearney is correct that he had no duty to give Travelers preferential treatment and he could choose to pay certain creditors over others.  However, I find that Mr. Kearney's denial that he used FTBB to place a friendly creditor in the position of Regions and block Travelers' efforts to collect on its judgment lacks credibility.  Had the Regions settlement been simply about paying off creditors, Mr. Kearney could have simply used a portion of his life insurance cash value[20] or taken another draw from the Moose line of credit to pay off the judgment.  There was

---

[19]It appears that Clayton, at least on occasion, wrote checks directly from his personal bank account which were later booked as capital contributions to Moose.

[20]The cash surrender value of this policy is generally exempt under Florida Statute § 222.14.

23

no need to inject a third party into the transaction and require an assignment of the debt in order to achieve a full settlement with Regions. But, as Mr. Kearney was well aware, if he had simply settled and paid off Regions, his funds at USAmeriBank would have become subject to collections by Travelers or some other creditor.

In the given circumstances, I think it naive to conclude that Mr. Kearney and Mr. Reed's use of a Kearney shelf company, FTBB, and Clayton's company, Moose, was necessary for any purpose other than to hinder creditors from collecting upon the USAmeriBank funds.

I also find the argument that this was a good use of Mr. Kearney's monies and a good investment for FTBB/Moose or Clayton disingenuous and self-serving at best. It appears Mr. Kearney borrowed the funds on his life insurance that was making 6% interest for a loan at 5.5% interest. He claims this was done in order to pay down a line of credit charging 3% interest. Moose then paid out $2.625 million on behalf of FTBB to buy a judgment incurring much less interest than the line of credit. Although the Regions judgment could conceivably net a positive return if fully executed and collected upon from all three judgment debtors, such was and is not assured and would likely entail significant efforts and expenditure on collections activities. As outlined above, FTBB has not shown any real interest in collection. Thus, rather than a good use of one's life insurance proceeds, I find it a more plausible explanation that Moose and FTBB were used by Mr. Kearney and James Reed to purchase the judgment because such was beneficial to Mr. Kearney and would keep the USAmeriBank funds "in the family" and fully accessible to Mr. Kearney through his line of credit.

As for Clayton or FTBB/Moose, FTBB was a Kearney "shelf company" for years when it was quickly activated by Kearney and Reed solely to facilitate this purchase and assignment.

24

It was neither capitalized nor capable itself in "investing" in the Regions judgment.  At present, it has done nothing to suggest it has any real interest in recovering on the judgment.  Moreover, it is not apparent that Clayton had anything to do with this purchase and assignment beyond signing papers prepared by Mr. Reed and allowing Moose's money to be used in the purchase.  Indeed, Clayton evidences little understanding of the business of either Moose or FTBB and it is clear that his father and Mr. Reed have considerable control over Moose's funds, investments, and decision-making.

Although Mr. Kearney and Mr. Reed assert that Clayton made "the ultimate decision" on the purchase of the Regions Judgment, he had no real voice or involvement in the transactions.  Based on the testimony and evidence presented, the actions necessary to accomplish the purchase and assignment of the Regions Judgment were conceived of, arranged, and accomplished by and between Bing Kearney and James Reed.

Even giving Messrs. Kearney and Reed the benefit of the doubt that Clayton has the final say in Moose's investments, I find it most improbable that this "investment" would have been made by FTBB or Moose had Mr. Kearney not needed his son's money and a blocking maneuver to assure that the USAmeriBank funds fell into friendly hands.

Further, I find that the use of an "insider" in this transfer evidence of collusion.  Even if Moose and FTBB do not fit the strict statutory definition of "insider," (*see* n. 17, supra; Fla. Stat. § 726.102(8)), the statute is not exclusive.  *See In re Bifani*, 580 F. App'x 740, 745 (11th Cir. 2014) (citing *United States v. Howard*, 742 F.3d 1334, 1348 (11th Cir. 2014) ("The items that follow each use of the word 'includes' in the statute are non-exhaustive examples....").  FTBB, wholly owned by Moose, which in turn is wholly owned by Clayton Kearney, is a functional

insider of the judgment-debtor here, Bing Kearney.  Bing Kearney's son—although insulated by

two layers of company ownership—took transfer of the Regions judgment.  In my view, FTBB

and Moose qualify and should be considered insiders of Bing Kearney.  By my consideration,

such provides a reasonable basis for finding collusion between Mr. Kearney and Mr. Reed to use

Clayton's companies to defeat legitimate collection efforts by Travelers.

Next, Mr. Kearney's orchestration and control over FTBB/Moose continued *after* the

purchase and assignment were complete.  This is evidenced in large part by the fact that Mr.

Kearney was directing FTBB's counsel not to act until speaking with his own counsel and the

fact that all records related to Regions' efforts to collect from the Kearneys were returned to Bing

Kearney's control rather than to FTBB.  That Mr. Kearney was delivering instructions to his new

judgment-creditor's counsel also smacks of collusion and/or control.  And, notably, FTBB's post-

assignment activities or lack thereof have been to the benefit of Mr. Kearney and his wife.

I also note there is some indication in this record that Mr. Kearney at least attempted to

disguise his full relationship with FTBB.  Rather than simply have Moose purchase the judgment,

Mr. Kearney and Mr. Reed determined to use a separate entity as a vehicle for the purchase and

assignment.  FTBB, a Delaware limited liability company, was an inactive and unknown entity

until its activation.  Moose, on the other hand, was a known quantity to Mr. Kearney's creditors.

The purchase and sale agreement, negotiated by Mr. Kearney, was "confidential," and FTBB,

Moose, aided by Mr. Kearney, sought to keep that agreement confidential and prevent discovery

of any financial relationship by and between them.  (*See* Docs. 524, 525).  Interestingly and

perhaps tellingly, in Bing Kearney's first affidavit regarding his financial arrangement with

Moose/FTBB, he attached a record of loan payments and re-payments to Moose.  A payment of

$2,625,000.00—the same amount as the Regions judgment purchase price—was recorded as a loan to Mr. Kearney. (Trav. Ex. 3 at 4). This "error" was later fixed in subsequent amortization tables presented by Moose and Mr. Kearney. (*See* FTBB Ex. 1; Doc. 798 at 124-26).

Given, the totality of the circumstances outlined above, I find that there is significant indicia of fraud to presume Mr. Kearney contrived or made the agreement with Regions for FTBB's purchase of the judgment with intent to hinder, delay, or defraud creditors. On the whole of the evidence, FTBB fails to rebut the presumption

## B.

It merits noting that the "transfer" at issue here is not your typical fraudulent transfer. Mr. Kearney did not simply transfer an asset to a family member to shield it from creditors. Rather, Mr. Kearney devised an elaborate scheme by which his son's company would purchase, among other things, a priority position to garnished funds and then convinced all of his other family members to consent to the garnishment to protect the assets from escaping family control. This assignment of the priority lien position that FTBB acquired to the USAmeriBank funds, followed by the Kearney's consent to disbursement of the funds is, in my view, the "transfer" actually at issue in this action.

Florida Statute § 726.102(12) provides an expansive definition of "transfer," allowing the court to look at "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." This statutory definition, along with judicial interpretation that these types of proceedings are to be liberally construed to afford

complete relief, leads me to the conclusion that the transfer here comes with the purview of Florida's proceedings supplementary and the UFTA.[21]

Furthermore, though the scheme to provide FTBB a priority lien position does not fit neatly into conceptions of the typical fraudulent transfer, I find that the cleverness or complexity of the maneuver is not a bar to relief.  Thus, although Mr. Kearney did not simply transfer the USAmeriBank funds to his son (or son's company) to keep them from other creditors, such was in my view the ultimate intent of Mr. Kearney.  Indeed, apart from stipulating to the release of the funds on Regions' writ, Mr. Kearney could not simply transfer the funds because the various accounts were frozen as a result of the ongoing collection efforts.  In order to accomplish the transfer in a manner most favorable to himself, Mr. Kearney and Mr. Reed had to enlist Clayton's aid in effectuating the transfer.  In this light, FTBB was not a bona fide purchaser for value without notice but rather a knowing and complicit participant or vehicle to shield Mr. Kearney's funds from Travelers and place them into FTBB's/Moose's friendly hands where Mr. Kearney maintained effective control.  Such guile is the sort intended to be addressed by the proceedings supplementary statute and the UFTA.

FTBB protests that Travelers has suffered no harm or injury because it was always in second position to Regions on the writ of garnishment and its position remains unchanged by

---

[21]*See, e.g., Mejia,* 985 So. 2d at 1112; *see also Ryan's Furniture Exch. v. McNair*, 120 Fla. 109, 119–20 (1935) ("[The statutes] were intended to give the circuit court broad discretionary powers to carry out the full intent and purpose of the proceedings supplementary to execution law which was to confer on circuit courts the right to subject any and all property, or property rights of any defendant in execution, however fraudulently conveyed, covered up, or concealed, the same might be, whether in the name or possession of third parties or not, to the satisfaction of an execution outstanding against him.") (discussing a prior version of the statute).

FTBB's assignment.  Again, I find this no bar to relief.  The proceedings supplementary statute, nor any case law presented, requires such a showing of harm or injury.[22]  Rather, the analysis under the Florida Statutes is the intent of the creditor.  *See* Fla. Stat. §56.29.  In any event, Travelers can claim harm from this fraudulent maneuver by Mr. Kearney

In conclusion, I find that the preponderance of the evidence reveals that Mr. Kearney contrived the scheme to hinder or delay creditors in achieving garnishment of the USAmeriBank funds.

## C.

In consideration of the above, the Court must determine the appropriate remedy.  The applicable statutes allow for broad discretion in fashioning relief in both law and equity.  In particular, the proceedings supplementary statutes provide, in pertinent part:

---

[22]FTBB's citation to *N.Y. Pub. Library v. Tilden*, 79 N.Y.S. 161 (Sup. Ct. 1902), a case out of New York from more than 100 years ago, does not compel a different conclusion. A thorough reading of that case reveals that the facts, circumstances, and findings of the court were decidedly different than here.  For instance, the *Tilden* court found:

> ... [O]ne of the purposes of the many transactions between the parties was the favorable settlement of the complicated financial affairs of the debtor and defendant, George H. Tilden; but that was only a purpose incidental to the general settlement of all of the affairs of the family and relatives, which were much complicated, and in some cases litigated, at the time. The evidence does not warrant a decision by this court, contrary to the findings of the referee, that there was any collusion between the parties to the said transactions and agreements. It is obvious that throughout all of their negotiations their interests were opposite, and each was mindful and insistent upon the protection and enforcement of the same. The nature and extent of their mutual rights and liabilities were carefully ascertained, deliberately computed, and strictly enforced.

*Id.* at 167.

I do not believe the same can be said here to support the conclusion that there was no fraud or collusion between the Mr. Kearney and his son's company.

> The court may order any property of the judgment debtor, not exempt from execution, in the hands of any person, or any property, debt, or other obligation due to the judgment debtor, to be applied toward the satisfaction of the judgment debt. The court may entertain claims concerning the judgment debtor's assets brought under chapter 726 and enter any order or judgment, including a money judgment against any initial or subsequent transferee, in connection therewith, irrespective of whether the transferee has retained the property.

Fla. Stat. § 56.29(5).

In addition, the UFTA specifically provides for remedies including: "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim," "attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with applicable law," or "[s]ubject to applicable principles of equity and in accordance with applicable rules of civil procedure... [a]ny other relief the circumstances may require." Fla. Stat. § 726.108.

In Count II, Travelers asks the Court to set aside, void, or disregard the assignment of the Regions judgment to FTBB. In retort, FTBB argues that the remedy proposed requires the unwinding or rescinding of the entire purchase and assignment, which it asserts cannot be ordered because Regions was not party to this proceeding supplementary. On the evidence presented and in the circumstances of this case, I find a more precise remedy is appropriate.

Travelers' judgment was entered in October 2011, prior to Regions' judgment entered nearly a year later in September 2012. Absent an agreement to hold execution in forbearance for a period of time (*see* Jt. Ex. 4 at ¶ 3), Travelers' judgment could have commanded a priority position relative to Regions. As it is, Regions was first to serve its writ on USAmeriBank and thereby held a priority lien position specifically to those funds, a priority lien position now

claimed by FTBB.  Travelers points to no other priority claim FTBB has made to Mr. Kearney's tangible or intangible property by virtue of the assignment.  Nor does Travelers proffer any evidence that the assignment of the Regions judgment was made or contrived to prevent creditors from collecting on any other particular asset of Mr. Kearney.

Because only the portions of the settlement agreement between the Kearneys and Regions and the purchase, sale, and assignment between FTBB and Regions which were directed toward the transfer of Regions' position in the garnishment litigation were intended to hinder the collection of USAmeriBank funds by outside creditors, the appropriate remedy concerns only the priority afforded to FTBB to the USAmeriBank funds.  Stated otherwise, a broad decree that the entire assignment of the Regions judgment be set aside or voided is unwarranted.  Rather, I find it appropriate in the circumstances presented that the district court void only the transfer to FTBB of Regions' priority lien position to the USAmeriBank funds and thereby prevent FTBB's claim to the priority lien position.

Mr. Kearney's orchestration of the transfer of Region's priority lien position to FTBB and the intended transfer of the USAmeriBank funds to his son's company is the conveyance of property that could have gone to Travelers in the absence of this scheme.  *See In re PSI Indus., Inc.*, 306 B.R. 377, 387 (Bankr. S.D. Fla. 2003); *Bay View Estates Corp. v. Southerland,* 114 Fla. 635, 652 (Fla. 1934).  In short, it is this conveyance—not the broader assignment of the Regions judgment—that should be prohibited and set aside.

Thus, I recommend that the district judge enter an order voiding or setting aside the transfer to FTBB of Regions' priority lien position relative to the USAmeriBank garnished funds and FTBB's claim to the same in all pending collection actions.  Given the court's discretion in

fashioning a remedy that the circumstances require, I find that the equities weigh in favor of this result and the resolution is in accord with equitable principles.[23]

## V.

Accordingly, in these proceedings supplementary, for the reasons set forth herein, I **RECOMMEND** that Judgment be entered in favor of Travelers and against FTBB as to Count II and the Court order and decree that the purported assignment of Regions' priority lien position to the USAmeriBank garnished funds be voided; that FTBB be prohibited from asserting a priority lien position to these funds in any pending collection action, including this case and the Regions case (Case No 8:09-cv-1841); and that Travelers, as against FTBB, be granted a superior lien position to the USAmeriBank funds.

Respectfully submitted this
10th day of February 2017.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

---

[23]The result I recommend is the functional equivalent of equitable subordination. As such, I find it unnecessary to address the alternative relief requested by Travelers in Count III.

Copies furnished to:
The Honorable James S. Moody, United States District Judge
Counsel of record