# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

KEARNEY CONSTRUCTION COMPANY
LLC,

           **Plaintiff,**

v.                                          **Case No. 8:09-cv-1850-T-30TBM**

TRAVELERS CASUALTY & SURETY
COMPANY OF AMERICA,

           **Defendant,**

v.

KEARNEY CONSTRUCTION COMPANY,
LLC, et. al,

           **Third Party Defendants.**

_____/

USAMERIBANK,

           **Garnishee.**

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on referral for a Report and Recommendation on three

summary judgment motions relating to a bank account held by USAmeriBank and subject to a

writ of garnishment:

> (1) FTBB, LLC's Second Motion for Summary Judgment on Travelers' Second
> Writ of Garnishment of Bing Kearney's USAmeriBank IRA Account (Doc. 805)
> and Travelers' response in opposition (Doc. 817);

(2) Bing Charles W. Kearney's Motion for Summary Judgment Finding IRA Funds Maintained in USAmeriBank Account Ending -1122 Exempt from Garnishment Pursuant to § 222.21, Florida Statutes (Doc. 811) and Travelers' response in opposition (Doc. 818); and

(3) Travelers' Motion for Final Summary Judgment in Garnishment as to the IRA Account (Doc. 815), FTBB's response in opposition (Doc. 816) and Kearney's response in opposition (Doc 819).

## I.

The pertinent procedural history has been detailed previously in a Report and Recommendation on several other motions related to the USAmeriBank garnishment (*see* Doc. 711), and for the sake of brevity will not be repeated in detail here.

The three motions currently at issue relate to Account -1122, which is held by USAmeriBank subject to a Writ of Garnishment issued by the Clerk on July 24, 2015. (Doc. 556, hereinafter "the Writ").[1]

On August 12, 2015, USAmeriBank answered the Writ, declaring that it was indebted to Mr. Kearney in the total amount of $1,158,037.38, such amount comprised of several accounts. (Doc. 577).

---

[1]The pleadings and motions sometimes refer to this as the "Second Writ of Garnishment." Travelers' first writ of garnishment directed to USAmeriBank was issued on September 26, 2014. (Doc. 279). For a variety of reasons, no judicial resolution or final judgment in garnishment was reached on this first writ and it dissolved by operation of law.

USAmeriBank identified the following seven accounts:

| Account No. | Account Holders | Amount Held |
|---|---|---|
| -0056 | Bing Kearney, Jr.<br>Tonya Nuhfer-Kearney | $625,305.39 |
| -3695 | Bing Kearney, Jr.<br>Tonya Nuhfer-Kearney<br>Charles Wesley Kearney III<br>Clayton Whitman Kearney | $28,345.60 (plus an additional $111.67 held pursuant to a state court writ of garnishment) |
| -0129 | Bing Kearney, Jr.<br>Tonya Nuhfer-Kearney<br>Charles Wesley Kearney III<br>Clayton Whitman Kearney | $4,426.41 |
| -0302 | Bing Kearney, Jr.<br>Charles Wesley Kearney III<br>Clayton Whitman Kearney | $1,185.17 (plus an additional $59.61 held pursuant to a state court writ of garnishment) |
| -0020 | Bing Kearney, Jr.<br>Charles Wesley Kearney III<br>Clayton Whitman Kearney | $39,722.31 |
| -7939 | Bing Kearney, Jr.<br>Bryan G. Kearney | $1,037.41 |
| -1122 | Bing Kearney, Jr. | $457,493.81 |

*Id.*

On October 21, 2015, Mr. Kearney filed an Amended Claim of Exemption and Request for Hearing. (Doc. 623).[2] Therein, he asserted exemptions from garnishment under the "head of family wages" exemption, "retirement or profit-sharing benefits or pension money," and "other exemptions as provided by law." *Id.*[3]

Six of the accounts (-0056, -3695, -0129, -0302, -0020, and -7939) were previously addressed in the Report and Recommendation entered on March 17, 2016 (Doc. 711) and adopted by the district judge on April 8, 2016 (Doc. 719). In that Report and Recommendation, the undersigned recommended deferring ruling on the claim of exemption as to the alleged IRA account (Account -1122) to permit additional discovery. (Doc. 711 at 13, n.10). Discovery was completed, and the instant motions are now ripe for review.

---

[2]Mr. Kearney initially filed a timely filed a Claim of Exemption and Request for Hearing on August 17, 2015, asserting exemption from garnishment under the "head of family wages" exemption and "other exemptions as provided by law." (Doc. 583). Travelers filed a motion to strike the Amended Claim of Exemption (Doc. 626), which this Court denied (Doc. 680).

[3]In the explanation section, Mr. Kearney states:
> The funds are tenants-by-the-entireties funds with my wife. Plaintiff does not have a judgment against my wife and, as a result, the funds are not susceptible to garnishment, as a matter of law.
> Also, there are numerous issues involved with such funds as a result of my (and my wife's) recent settlement with Regions Bank, which can be explained in more detail upon a hearing of my claim of exemption.

*Id*. at 2.

## II.

In accordance with Federal Rule of Civil Procedure 56, summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party. *Fennell,* 559 F.3d at 1216 (citing *Welding Servs., Inc.,* 509 F.3d at 1356). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the court that there is an absence of evidence to support the non-moving party's case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted). When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. *Porter v. Ray*, 461 F.3d 1315, 1320–1321 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value."). "If a party fails to properly support an assertion of fact or fails to properly address another party's

assertion of fact … the court may ... grant summary judgment if the motion and supporting materials ... show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.

FTBB moves for summary judgment asserting, "In the event the Court determines that the USAmeriBank IRA funds are <u>not</u> exempt from garnishment, then [FTBB] asserts a priority claim to the funds."  (Doc. 805 at 5) (emphasis in original).  FTBB's claim of priority is based factually on Regions' sale and assignment of its judgment against Mr. Kearney and others to FTBB in April 2015.  It argues because the Regions writ was first in time, FTBB takes Regions' position and, thus, has priority over Travelers' Writ.[4]  (*See generally* Doc. 805).

Travelers opposes the motion and moves to strike FTBB's motion for summary judgment on the bases that FTBB lacks standing to present its claim; that FTBB disclaimed its interest in the IRA account and is equitably estopped from asserting a priority claim; and Travelers is entitled to a priority interest in the IRA account under the "diligent creditor rule." (Doc. 817).

This Court has previously found that FTBB has failed to present a valid claim to the garnished funds in accordance with Florida's garnishment statutes.  (*See* Doc. 711 at 33).  On that basis alone, FTBB's motion should be denied.

In any event, FTBB has no valid basis to claim priority to the IRA account.  The Writ in the Regions case did not include the IRA account.  According to USAmeriBank's Answer,

---

[4]The motion is supported by copies of the settlement documents, the Assignment of the Regions Judgment, and pleadings in the Regions case.  (Docs. 805-1 – 805-5).

Account -1122 is not subject to any prior writ of garnishment. (Doc. 577; *see also* Regions case, Doc. 212). Thus, FTBB has no perfected priority position to these funds.

In addition, in the proceedings supplementary this Court recommended that FTBB should be prohibited from asserting a priority lien position to the USAmeriBank funds. (Doc. 828). The district judge adopted the recommendation, ordering, in pertinent part:

> The purported assignment of Regions' priority lien position to the USAmeriBank garnished funds to FTBB, LLC is hereby VOIDED.
> FTBB, LLC is prohibited from asserting a priority lien position to the USAmeriBank garnished funds in any pending collection action, including this case and the Regions case (case number 8:09-cv-1841-T-17MAP).
> TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, as against FTBB, LLC, is GRANTED a superior lien position to the USAmeriBank funds.

(Doc. 831).

FTBB has no present ability to claim a priority lien position to the USAmeriBank funds, including the alleged IRA account. Accordingly, **FTBB's Motion for Summary Judgment** (Doc. 805) should be **denied.**

## IV.

## A.

Next, Mr. Kearney and Travelers submit cross-motions for summary judgment. (Docs. 811, 815). The cross-motions raise two main issues: (1) whether or not the funds were properly rolled over to an IRA account within the sixty-day period provided in Section 408 of the Internal Revenue Code or otherwise qualify for a waiver of the sixty-day rollover period; and (2) whether or not the funds lost their exempt status on the basis of Mr. Kearney's pledge of collateral in his security agreement with Moose Investments.

By his motion (Doc. 811), Mr. Kearney argues that the funds held in Account -1122 are exempt from garnishment pursuant to Florida Statute § 221.21(2) and the applicable provisions of the Internal Revenue Code. He urges that even where funds are "rollover contributions," such as in this case, they do not lose their exempt status if they are deposited into a new individual retirement account or individual retirement annuity "not later than the 60th day after the day on which [the person] receives the payment or distribution" from the previous individual retirement account or annuity. And, even if they were not rolled-over within the sixty day period, Mr. Kearney is entitled to a waiver of that deadline pursuant to 26 U.S.C. § 408(d)(3)(I). Mr. Kearney claims that the undisputed facts show that he fully intended and did everything required under the law to maintain his IRA funds in an exempt IRA account, and any failure to comply with the sixty-day provision for rollover of the funds was beyond his control and does not invalidate the exempt status of these funds.[5]

By its cross-motion and in its response (Docs. 815, 818), Travelers claims Mr. Kearney failed to maintain the alleged IRA account in accordance with the tax code. Travelers argues Mr. Kearney has failed to establish that a waiver of the sixty-day deadline for rollover of the funds is warranted. By this argument, Mr. Kearney must establish that the untimely rollover was solely USAmeriBank's fault and he has not done so. Rather, Travelers argues the evidence shows Mr. Kearney failed to follow the bank's instructions to effectuate the rollover in a timely manner. Travelers further argues Mr. Kearney pledged the IRA as security to Moose Investments of

---

[5]In support, Mr. Kearney has filed the Deposition of Mr. Kearney's CPA Justin Rowlson (Doc. 802), the Deposition of USAmeriBank employee Cami Gibertini and exhibits (Docs. 803, 806–810), as well as the affidavits of Bing Kearney (Doc. 811-1) and Justin Rowlson (Doc. 811-2).

Tampa, LLC, pursuant to the Promissory Note and Security Agreement, in which he pledged all accounts or rights to payments as collateral. It asserts the pledge of the account as collateral caused the account to lose its tax-exempt status and thus lose its exempt status from garnishment.

Mr. Kearney responds that he did not pledge or intend to pledge his tax-exempt IRA funds to Moose. He argues there is a latent ambiguity in the Promissory Note and Security Agreement as to whether the IRA account was included and the evidence shows the intent of the parties was not to include exempt assets in the pledge. He again urges that the failure to comply with the sixty-day rollover period was the fault of USAmeriBank and he has presented substantial evidence supports his claim that the error was due to USAmeriBank's delay, not his own. (Doc. 819).[6]

## B.

The timeline of events pertinent to these motions is largely undisputed.

On March 1, 2012, Mr. Kearney executed a Revolving Line of Credit Promissory Note in favor of his son Clayton's company, Moose Investments of Tampa, LLC ("Moose"). (Doc. 815-18). The Promissory Note is collateralized by a Security Agreement in which Mr. Kearney pledged a security interest in:

> ...all assets and rights of the Pledgor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof, all good (including inventory, equipment and any accessories thereto), instruments (including promissory notes) documents, accounts, chattel paper, deposit accounts, letters of credit, rights, securities and all other investment property, supporting obligation, any contract or contract rights or rights to

_____

[6]FTBB also filed a response in opposition to Travelers' motion for summary judgment. (Doc. 816). However, given the findings and conclusions above with regard to FTBB, I find no reason to address its arguments.

the payment of money, insurance claims, and proceeds, and general intangibles (the "Collateral").

(Doc. 815-18 at 4).

On August 6, 2012, Moose recorded a UCC-1 with the Florida Secured Transaction Registry as to the above assets. (Doc. 815-19).

On October 25, 2012, Mr. Kearney deposited $448,646.03 into IRA account at USAmeriBank ending in -0374. (Doc. 806 at 11–15; Doc. 815-4). The deposit was comprised of $403,601.89 rolled over from Kearney's previously existing IRA account at USAmeriBank, account -0871, and $45,044.14 deposited as a rollover contribution from Mr. Kearney's IRA account at Platinum Bank. (*Id.*, *see also* Doc. 815-5).

On October 27, 2014, Mr. Kearney, through his bookkeeper, Amber Lastres (a/k/a Amber Proctor), requested that the funds from his IRA account be transferred into a day-to-day money market account held jointly by he and his wife Tonya Nuhfer-Kearney as tenants by the entirety. (*See* Doc. 808 at 6–7) ("Bing does not want to renew the attached IRA, please transfer funds into a day to day money market account. Bing & Tonya Kearney signers Tenants by entireties. Thanks, Amber"). The following day, $455,119.97 was withdrawn from the IRA account -0374 and transferred to a money market account -0223. (Docs. 815-7 – 815-8). On October 29, 2014, Mr. Kearney signed an IRA Distribution Form authorizing USAmeriBank to distribute the $455,119.97 in the IRA account ending -0374 via official check. (Doc. 807 at 18–19; Doc. 815-9). The date of distribution listed on that form was October 28, 2014. *Id.*

Also on October 29, 2014, Amber Lastres requested via email that the money market account be changed to an IRA money market account with only Mr. Kearney on the account.

(Doc. 808 at 10).  She also stated, "I have the IRA distribution form signed and will bring the original to you.  Thank you, Amber."  *Id.*

Thereafter, Amber Lastres exchanged several emails with USAmeriBank representatives regarding the funds, wherein there appears confusion about the status of the funds and where the funds were being held.  On November 6, 2014, in an email exchange between Amber Lastres and Jennifer Havener of USAmeriBank, Ms. Lastres asked, "When does he [Kearney] need to let you know before the IRA automatically renews?  Thanks. Amber."  (Doc. 808 at 11).  Ms. Havener responded, "The funds were transferred to the Money Market on the 28th.  From that date he has 60 days to roll those funds over into a new IRA."  *Id.*  Ms. Lastres replied, "Why were they transferred to a money market?  He did not sign anything yet."  *Id.*

Again on November 13 and 14, 2014, Ms. Lastres and USAmeriBank representatives exchanged emails regarding the status of the funds.  *Id.* at 16–23.  In that exchange, Cami Gibertini stated:

> OK, Bing will have 60 days under the rules of an IRA Transfer before he has to consider any tax implications. So, I need that form signed and returned so we can make certain there is none. That's first.
> Secondly, we'll get the funds back in a IRA/CD today. Please confirm the term.

(Doc. 808 at 18).

Ms. Lastres replied, "Sorry 12 mos.  If that one is the shortest and same as last one."  *Id.* With regard to the form, Ms. Lastres stated, "He is not in the office today, so next week for the form."  (Doc. 809 at 4).

On December 1, 2014, after apparently receiving a statement from the money market account dated November 16, 2014, reflecting a $455,244.68 balance, Ms. Lastres inquired about

11

the status of the funds. (Doc. 809 at 1–3). Ms. Lastres, Havener, and Gibertini exchanged several emails over the course of the next days; Mr. Kearney was copied on several of these emails. (Doc. 809 at 10–26). On December 2, 2014, Ms. Lastres sent an email to Ms. Gibertini, which stated:

> Regarding your email to Bing today asking if he wanted to still move funds from the money market to his IRA.
> I returned the signed originals (attached) that you requested to the bank the day we talked in your email below. We thought the funds were already moved from the money market on November 14th back to the IRA per your email below?
> Please see attached copies. Please move funds from the money market to the IRA.

(Doc. 809 at 16–17).

Ms. Gibertini responded: "Recall that in that timeframe from signing and returning the paperwork the garnishment came in, so funds were held. We will generate the IRA/CD and send for signatures tomorrow. We cannot move funds until we receive originals back." *Id.* at 15. Ms. Lastres replied: "We did not know about a garnishment/funds held on that account, I brought the originals to the bank and asked that (the teller that day either Yuri or Kriscinda) give to you...." *Id.*

The following day, Ms. Gibertini sent an email to Ms. Lastres and Mr. Kearney, which stated:

> Amber/Bing – OK, let's try and get on the same page today. On 10/27, upon Bing's IRA/CD maturity we were directed to open a new Joint TBE account with Bing & Tonya (via e-mail to Jennifer). We proceeded and sent for signatures. We waited with no return of originals, then as your initial e-mail below references he decided to place into a CD on 11/13. We asked repeatedly for the signature card and IRA distribution form to be signed and that we needed originals before we could proceed with a new IRA/CD. Then on 11/18, we received the garnishment and the funds were

placed on hold. Here's the activity and as you can see it matches his statement.

So, we can setup his IRA/CD for 12 mos at 0.90% apy today however we will not move the funds until all original forms are signed and back in our hands at the bank.

Please tell me how to proceed.

(Doc. 809 at 11–12).

The same day, Ms. Lastres replied:

> Yes please move funds to IRA/CD today, send signature docs I will get them back to you a.s.a.p. I am not sure why you never received the original docs that I brought on Friday 11/14/14 I gave to Yuri, the teller that day. We did request a money market to move IRA funds, but when we found out it was not an IRA money market Bing did not want to move funds, that is why we did not return the signature cards for the money market. You asked to return the money market signature docs since the funds were already moved. I returned the IRA/money market originals 11/14/14 per your email you said you would move the funds that day 11/14/14 that is why I brought the originals over right away. If the funds where (sic) moved that day or even on the 17th the funds would not have been garnished/placed on hold. We were unaware of the funds garnished/placed on hold, we thought they were moved back to IRA on 11/14/14 per your email.

(Doc. 809 at 11).

Ms. Gibertini then forwarded the email to Ms. Havener on December 3, 2014, and instructed her to "Please open a 12 mos IRA/CD for Bing at 0.09% apy." *Id.*

Later that day, Ms. Havener emailed Ms. Lastres, stating "Amber, Please see the attached IRA documents. Please have Bing sign where indicated and drop the originals off to us. We will transfer funds upon receipt of the paperwork." *Id.* at 25. Ms. Lastres acknowledged receipt. *Id.*

On December 8, 2014, Ms. Havener requested: "Amber, Can you please have Bing initial under the ownership sections and scan back to us?" Ms. Lastres responded: "Will do, can you

please check on the email I sent this morning, regarding funds released back into his accounts?" (Doc. 809 at 27).

The IRA Application is signed by Bing Kearney and is dated December 29, 2014.[7] (Doc. 807 at 1–2). The "Contribution Date" that appears on the Application is December 3, 2014. *Id.*

On January 2, 2015, USAmeriBank deposited the funds into a new IRA account ending -1122. (Doc. 815-15).

## C.

As noted above, Mr. Kearney claims the funds in Account -1122 are exempt from garnishment pursuant to § 222.21(2) of the Florida Statutes. This statute provides for an exemption from creditors' claims of funds and accounts maintained in accordance with a plan or

---

[7]Mr. Kearney and Travelers disagree about what date this form was actually signed and/or returned to USAmeriBank.

Ms. Gibertini testified that the date appearing next to Mr. Kearney's signature looks like Jennifer Havener's handwriting. She believed she had an email indicating that the bank received the form on December 30th from Amber Lastres. (Doc. 806 at 81–83).

Ms. Lastres (Proctor) testified as follows:

> Q In the e-mail on the bottom of Page 1 dated December 30th,
> 2014 at 11:46, she asks you to -- she's following up with you to
> see if Bing has signed the original IRA paperwork. Do you
> know what original IRA paperwork she is referencing?
> A I would guess the one that they were renewing.
> Q Then you respond that, yes, you'll bring to the bank today.
> And then it appears -- you sent that e-mail at 11:47. Correct?
> A Yes.
> Q And then at 1:15, she writes back, "Thank you. I received it."
> So did you go to the bank with the paperwork that day?
> A I guess so.

(Doc. 812 at 62–63).

An email exchange between Ms. Havener and Ms. Lastres on December 30, 2014, appears to confirm that USAmeriBank received the original "IRA paperwork" on December 30, 2014. *Id.* at 133.

14

governing instrument that has been determined by the Internal Revenue Service to be exempt from taxation under Section 408 (among other provisions) of the Internal Revenue Code. Fla. Stat., § 222.21(2)(a). Such accounts must be maintained in accordance with a plan or governing instrument in compliance or substantial compliance with section 408 of the Internal Revenue Code. *Id.*

The applicable portion of § 222.21(2)(a) provides as follows:

> Except as provided in paragraph (d), any money or other assets payable to an owner, a participant, or a beneficiary from, or any interest of any owner, participant, or beneficiary in, a fund or account is exempt from all claims of creditors of the owner, beneficiary, or participant if the fund or account is:
> 1. Maintained in accordance with a master plan, volume submitter plan, prototype plan, or any other plan or governing instrument that has been preapproved by the Internal Revenue Service as exempt from taxation under s. 401(a), s. 403(a), s. 403(b), s. 408, s. 408A, s. 409, s. 414, s. 457(b), or s. 501(a) of the Internal Revenue Code of 1986,1 as amended, unless it has been subsequently determined that the plan or governing instrument is not exempt from taxation in a proceeding that has become final and nonappealable;
> 2. Maintained in accordance with a plan or governing instrument that has been determined by the Internal Revenue Service to be exempt from taxation under s. 401(a), s. 403(a), s. 403(b), s. 408, s. 408A, s. 409, s. 414, s. 457(b), or s. 501(a) of the Internal Revenue Code of 1986,1 as amended, unless it has been subsequently determined that the plan or governing instrument is not exempt from taxation in a proceeding that has become final and nonappealable; or
> 3. Not maintained in accordance with a plan or governing instrument described in subparagraph 1. or subparagraph 2. if the person claiming exemption under this paragraph proves by a preponderance of the evidence that the fund or account is maintained in accordance with a plan or governing instrument that:
> a. Is in substantial compliance with the applicable requirements for tax exemption under s. 401(a), s. 403(a), s. 403(b), s. 408, s. 408A, s. 409, s. 414, s. 457(b), or s. 501(a) of the Internal Revenue Code of 1986,1 as amended; or

> b. Would have been in substantial compliance with the applicable requirements for tax exemption under s. 401(a), s. 403(a), s. 403(b), s. 408, s. 408A, s. 409, s. 414, s. 457(b), or s. 501(a) of the Internal Revenue Code of 1986,1 as amended, but for the negligent or wrongful conduct of a person or persons other than the person who is claiming the exemption under this section.

Fla. Stat., § 222.21(2)(a).

Section 408 of the Internal Revenue Code sets forth six requirements with which a trust

instrument or account must comply to qualify as an IRA, providing, in pertinent part:

> Individual retirement account.--For purposes of this section, the term "individual retirement account" means a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets the following requirements:
> (1) Except in the case of a rollover contribution described in subsection (d)(3) in (internal footnote omitted) section 402(c), 403(a)(4), 403(b)(8), or 457(e)(16), no contribution will be accepted unless it is in cash, and contributions will not be accepted for the taxable year on behalf of any individual in excess of the amount in effect for such taxable year under section 219(b)(1)(A).
> (2) The trustee is a bank (as defined in subsection (n)) or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such other person will administer the trust will be consistent with the requirements of this section.
> (3) No part of the trust funds will be invested in life insurance contracts.
> (4) The interest of an individual in the balance in his account is nonforfeitable.
> (5) The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund.
> (6) Under regulations prescribed by the Secretary, rules similar to the rules of section 401(a)(9) and the incidental death benefit requirements of section 401(a) shall apply to the distribution of the entire interest of an individual for whose benefit the trust is maintained.

26 U.S.C. § 408(a).

In addition, the Internal Revenue Code contains provisions governing the rollover of IRA accounts.  Specifically, § 408(d)(3) of the Internal Revenue Code provides:

> Rollover contribution.--An amount is described in this paragraph as a rollover contribution if it meets the requirements of subparagraphs (A) and (B).
>
> (A) In general.--Paragraph (1) does not apply to any amount paid or distributed out of an individual retirement account or individual retirement annuity to the individual for whose benefit the account or annuity is maintained if—
>
> (i) the entire amount received (including money and any other property) is paid into an individual retirement account or individual retirement annuity (other than an endowment contract) for the benefit of such individual **not later than the 60th day after the day on which he receives the payment or distribution**; or
>
> (ii) the entire amount received (including money and any other property) is paid into an eligible retirement plan for the benefit of such individual **not later than the 60th day after the date on which the payment or distribution is received**, except that the maximum amount which may be paid into such plan may not exceed the portion of the amount received which is includible in gross income (determined without regard to this paragraph).
>
> For purposes of clause (ii), the term "eligible retirement plan" means an eligible retirement plan described in clause (iii), (iv), (v), or (vi) of section 402(c)(8)(B).

26 U.S.C. § 408(d)(3) (emphasis added).

And, § 408(e)(4) provides:

> Effect of pledging account as security.--If, during any taxable year of the individual for whose benefit an individual retirement account is established, that individual uses the account or any portion thereof as security for a loan, the portion so used is treated as distributed to that individual.

26 U.S.C. § 408(e)(4).

As explained by Florida's Third District Court of Appeal, "the purpose of [Florida Statute § 222.21] is to confer on retirement plans a broad exemption from the claims of creditors" and

the Florida Legislature "made the policy decision that it should protect the assets of IRA's and pension plans." *Dunn v. Doskocz*, 590 So. 2d 521, 522, n.2 (Fla. Dist. Ct. App. 1991).

Under Florida law, "[e]xemption statutes ... should be liberally construed in favor of a debtor so that he and his family will not become public charges." *Killian v. Lawson*, 387 So. 2d 960, 962 (Fla. 1980) (citations omitted); *see also Ulisano v. Ulisano*, 154 So. 3d 507, 508 (Fla. Dist. Ct. App. 2015), reh'g denied (Jan. 23, 2015); *and see In re Stevenson*, 374 B.R. 891, 894 (Bankr. M.D. Fla. 2007) (citing *Tramel v. Stewart,* 697 So. 2d 821 (Fla. 1997) and *Graham v. Azar,* 204 So. 2d 193 (Fla. 1967)) ("[T]he Court is mindful of the general proposition that laws governing exemptions in Florida are designed to assist debtors to retain properties which are deemed necessary for the debtor's support and support of the debtor's dependents, and generally shall be liberally construed and broadly interpreted in favor of the claim of exemption, and strictly against the objecting party's claim.")). The debtor bears the burden of proving entitlement to an exemption. *See, e.g., Cullen v. Marsh,* 34 So. 3d 235, 242 (Fla. Dist. Ct. App. 2010)*; Brock v. Westpost Recovery Corp.*, 832 So. 2d 209 (Fla. Dist. Ct. App. 2002); *In re Parker*, 147 B.R. 810, 812 (Bankr. M.D. Fla. 1992).

## D.

With regard to the first issue—whether or not the funds were properly rolled over to an IRA account within the sixty-day period provided in § 408 of the Internal Revenue Code or otherwise qualify for a waiver of the sixty-day rollover period—I find genuine issues of material fact preclude summary judgment. On the record presented, while it appears clear that the funds did not land in an IRA account within the sixty-day window permitted, it remains unclear to this

Court whether the rollover of funds qualifies for a waiver of the sixty-day deadline or that the account is otherwise in substantial compliance with § 408 of the Internal Revenue Code.

Based on the timeline of events set forth above, Mr. Kearney, through his bookkeeper Amber Lastres (Proctor), directed USAmeriBank to withdraw IRA funds to establish a money market account on October 28, 2014. Almost immediately after the funds were moved by USAmeriBank, Mr. Kearney attempted to re-established an IRA account. Ms. Lastres communicated with USAmeriBank representatives about the transfer. Despite some confusion and miscommunication between the parties, in a light favorable to Mr. Kearney, USAmeriBank representatives made representations that the funds would be transferred within the sixty day rollover period but such did not occur. For example, as of the email exchange on December 2, 2014, Ms. Lastres indicated that she had returned signed, original forms for the transfer on November 14, 2014. (*See* Doc. 809 at 11, 16–17). The bank, for reasons unexplained on this record, did not receive those forms at that time and did not transfer the funds on that date.

Thereafter, it does appear there was a delay in submitting or re-submitting the signed IRA contribution forms until December 29 or 30, and it is undisputed that the funds were not actually transferred until January 2, 2015. However, the "Contribution Date" on the signed IRA form was December 3, 2014 (Doc. 807 at 1–2), the bank has continued to treat the account as an IRA, and Mr. Kearney claims he has continued to claim the funds as tax-exempt on his filings with the IRS. Mr. Kearney and his representatives certainly could have been more diligent in their efforts to ensure the timely transfer of the funds back into an IRA. Nonetheless, there were miscommunications, conflicting instructions, and arguable delay by the bank in getting the funds transferred back into an IRA account. At a minimum, USAmeriBank representatives conveyed

somewhat mixed messages about when exactly the funds would be transferred and what Kearney needed to do to effectuate the transfer.[8]

Although the funds did not ultimately transfer within the sixty-day period, by my consideration, factual issues remain as to whether the funds should nonetheless be entitled to protection from creditors under Florida law. Under the applicable exemption statute, the debtor need only be in "substantial compliance" with the Internal Revenue Code. Fla. Stat., § 221.21(2)(a)(3)(a). In light of the admonition that exemption statutes should be liberally construed in favor of a debtor, I am constrained to conclude that the facts surrounding the late transfer of the funds are in need of further development to determine whether such substantial compliance has been met. As such, on this record and as to this issue, I cannot definitively say that Mr. Kearney is not entitled to the benefit of the retirement funds exemption under Florida Statute § 221.21(2)(a).

Accordingly, the cross-motions for summary judgment on the issue of Account -1122's compliance with the sixty-day rollover provision of § 408 of the Internal Revenue Code should be **denied.**

---

[8]For instance, on November 14, 2014, Ms. Gibertini stated:

> OK, Bing will have 60 days under the rules of an IRA Transfer before he has to consider any tax implications. So, I need that form signed and returned so we can make certain there is none. That's first.
> **Secondly, we'll get the funds back in a IRA/CD today.** Please confirm the term.

(Doc. 808 at 18) (emphasis added).

## E.

With regard to Travelers' second argument—whether Mr. Kearney pledged the account as security for a loan—I find no material issue of fact to preclude summary judgment in Travelers' favor. On the record presented, Mr. Kearney pledged his IRA funds as collateral to Moose and thereby forfeited those funds' exempt status. Mr. Kearney fails to present evidence supported by specific facts that demonstrate there is a genuine issue for trial.

The Internal Revenue Code provides: "If, during any taxable year of the individual for whose benefit an individual retirement account is established, that individual uses the account or any portion thereof as security for a loan, the portion so used is treated as distributed to that individual." 26 U.S.C. § 408(e)(4). The Fifth Circuit has explained, "Pledging IRA funds as security for a loan thus has the same tax effect as withdrawing the same funds from an IRA and investing them in non-IRA CDs." *Lewis v. Bank of Am.*, 343 F.3d 540, 545 (5th Cir. 2003). Courts have determined that the pledge of such funds means that they are no longer exempt. *See, e.g., In re Roberts*, 326 B.R. 424, 426 (Bankr. S.D. Ohio 2004) ("a debtor's pledge of his IRA as collateral for a loan, especially a business loan, is inconsistent with the need to protect that money as a future income stream for the debtor as against the debtor's creditors."); *XL Specialty Ins. Co. v. Truland*, 2015 WL 2195181, at *11–13 (E.D. Va., May 11, 2015) (finding an unqualified pledge of all assets in an indemnity agreement encompassed retirement accounts, the

pledge of the § 408 (IRA) account was valid, and the funds could be used to satisfy the judgment).[9]

As discussed above, the Promissory Note made by Mr. Kearney for his payment obligations to Moose provides that it "is collateralized by a pledge of all of [Kearney's] personal property and intangibles." (Doc. 815-18 at 2). In the associated Security Agreement, Mr. Kearney pledged:

> ... all assets and rights of the Pledgor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof, all good (including inventory, equipment and any accessories thereto), instruments (including promissory notes), documents, accounts, chattel paper, deposit accounts, letters of credit, rights, securities and all other investment property, supporting obligation, any contract or contract rights or rights to the payment of money, insurance claims, and proceeds, and general intangibles (the "Collateral").

*Id.* at 4.

In his response to Travelers' motion for summary judgment, Mr. Kearney claims that there is latent ambiguity in the Security Agreement with respect to what he and Moose intended to be pledged as collateral pursuant to his loan from Moose. (Doc. 819 at 5). He also argues that the documents do not specify whether the IRA account was intended to be pledged as a "deposit

---

[9]Neither side cites any Florida case law specifically on the issue of pledging a retirement account as collateral. However, as discussed above, the Florida Statutes provide that retirement accounts are exempt if in substantial compliance with the applicable Internal Revenue Code provisions. *See* Fla. Stat., § 222.21.

account." *Id.*[10]   Because a "latent ambiguity" exists, he urges the Court to look to extrinsic

evidence, such as the parties' intent. *Id.* at 5–6.

In his Affidavit in opposition to Travelers' motion, Mr. Kearney states, in pertinent part:

> I did not, at any time, pledge my exempt IRA funds previously maintained in USAmeriBank account ending -0374 to Moose Investments of Tampa, LLC, as collateral for any loan and/or extension of credit....
>
> At all times, it was always understood by me personally, and [Moose] that this pledge of collateral would not encompass any exempt retirement funds owned by me ... It was never my intent to pledge these exempt retirement funds as collateral to Moose, nor was it my intent to have the Loan Documents construed in a manner that would result in the exempt retirement funds ... being pledged as collateral to Moose.
>
> It was never the intent of Moose Investments of Tampa, LLC, that the exempt retirement funds... would be pledged as collateral pursuant to the execution of the Loan Documents. At all times, Moose understood that those agreements would not encompass my exempt retirement funds, and that those funds would in no way be pledged as collateral for the extension of the $5,000,000.00 line of credit from Moose.

(Doc. 819-1 at ¶¶ 3–6).[11]

At summary judgment, the court must draw all reasonable inferences in favor of the

nonmovant, should not weigh the evidence, and should refrain from making credibility

---

[10]Mr. Kearney also argues that Travelers cannot argue that he pledged his IRA account as collateral because it previously argued that the pledge was insufficient to create a superior lien position.  Such argument is entirely unpersuasive.

[11]James Reed, manager of Moose, signed a similar affidavit.  (Doc. 819-2).  However, on Travelers' motion, this Court struck Mr. Reed's affidavit as inconsistent with prior sworn testimony under the "sham affidavit" rule.  (Doc. 861).
As more fully discussed below, Mr. Kearney's statements about the intent of Moose are entirely unpersuasive, given that he provides no foundation for such statement and particularly in light of Moose's prior statements to the contrary.

determinations about competing affidavits.  *See Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 150–51 (2000).  An entirely self-serving affidavit may overcome summary judgment. *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir.), as modified on denial of reh'g, 425 F.3d 1292 (11th Cir. 2005) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage.").  However, "[c]onclusory, uncorroborated allegations ... in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion.  *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); *see also Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (recognizing that "to defeat a motion for summary judgment, [the party] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient" (quotations and citation omitted)); *Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (stating that "a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

Mr. Kearney's statements submitted here are contradicted by the plain, unambiguous language of the Security Agreement he signed, in which he pledged all of his personal property without exception.  And, despite Mr. Kearney's current position that he never pledged or intended to pledge his IRA account as collateral to Moose, his statements are not only self-

serving but also are conclusory, uncorroborated, and indeed contradicted by other evidence record.  As set forth below, Moose affirmatively took a contrary position when seeking to dissolve the Writ.  And, when it suited his interest in September 2015, Mr. Kearney moved in support of Moose's claim to the funds held by reason of the Writ.

The undisputed facts show that Moose made a claim in this action to a superior interest in the USAmeriBank garnished funds (including the IRA funds).  In an affidavit filed in support of Moose's Motion to Dissolve Travelers' Second Writ of Garnishment (Doc. 595), Mr. Reed stated:

> By virtue of the fact that Moose Investments' UCC-1 was filed with the Florida Secured Transaction Registry on August 6, 2012, Moose Investments' UCC-1 is a superior security agreement and maintains a priority position to that of Travelers' Second Writ of Garnishment to USAmeriBank....
>
> Based upon the priority position of Moose Investments' perfected UCC-1 to that of Travelers' Second Writ of Garnishment to USAmeribank, Moose Investments claims entitlement to the garnished funds subject to Travelers' Second Writ of Garnishment.

(Doc. 598 at ¶¶ 7–8).

The sworn statements made by Mr. Reed in his September 2015 affidavit were made for the purpose of seeking affirmative relief in this Court to have the Writ of Garnishment dissolved. Mr. Reed made no distinction or exception in making Moose's claim to the entirety of the garnished funds.  *Id.*  Thus, at least as of September 2015, Moose believed that it had a claim to the alleged IRA account by virtue of its Security Agreement and UCC-1.  This is inconsistent with the position Mr. Kearney now asks the Court to accept—that both he and Moose understood the agreement did not encompass his retirement funds.

25

In addition, Mr. Kearney himself previously took a contrary position. In his court filing in September 2015, Mr. Kearney supported Moose's claim to a superior lien position to the garnished funds held by USAmeriBank. (*See* Doc. 596 at 3) ("By virtue of the fact that Moose Investments' UCC-1 was filed with the Florida Secured Transaction Registry on August 6, 2012, Moose Investments' UCC-1 is a superior security agreement and maintains a priority position to that of Travelers' Second Writ of Garnishment to USAmeriBank.").[12] Mr. Kearney made no distinction or exception in supporting Moose's claim to the entirety of the garnished funds. Rather, in that instance, he supported Moose's claim to the funds now at issue, which significantly undermines his current position.

Furthermore, the language of Security Agreement is clear, unambiguous, and without exception that Mr. Kearney pledged all of his personal property, wherever found and whether then owned or thereafter acquired. Despite Mr. Kearney's assertions to the contrary, I find no ambiguity, latent or otherwise, in the Security Agreement.

Ambiguities can either be patent or latent. *Saenz v. Campos*, 967 So. 2d 1114, 1117 (Fla. Dist. Ct. App. 2007). A patent ambiguity is one that appears on the face of the document. *Id.* "A latent ambiguity ... arises where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." *Mac-Gray Services, Inc. v. Savannah Associates of Sarasota, LLC*, 915 So. 2d 657, 659 (Fla. Dist. Ct. App. 2005) (internal

---

[12]As discussed previously, Mr. Kearney's motion to dissolve the Writ was unverified and unsworn. As such, on Travelers' request, the Court determined that Mr. Kearney's Affidavit was not inconsistent with prior <u>sworn</u> testimony and did not strike it as a "sham affidavit." (*See* Doc. 861).

quotations and citation omitted).  A latent ambiguity thus exists "[i]f a contract fails to specify the rights or duties of the parties under certain conditions or in certain situations, [and] the occurrence of such condition or situation reveals an insufficiency in the contract not apparent from the face of the document." *Hunt v. First Nat'l Bank of Tampa*, 381 So. 2d 1194, 1197 (Fla. Dist. Ct. App. 1980).  Under Florida law, "when a contract is rendered ambiguous by some collateral matter, it has a latent ambiguity, and the court must hear parol evidence to interpret the writing properly." *RX Solutions, Inc. v. Express Pharmacy Servs., Inc.*, 746 So. 2d 475, 476 (Fla. Dist. Ct. App. 1999).

Mr. Kearney asserts, "it is clear that ... a latent ambiguity exists with respect to what [he] and Moose intended to be pledged as collateral [because] the documents do not specify whether Bing Kearney's exempt IRA account with USAmeriBank was intended to be pledged as a 'deposit account' for purposes of those agreements." (Doc. 819 at 5–6).  But the issue of whether or not the alleged IRA account is a "deposit account" is something of a red herring.  Whether the IRA funds or account qualify as a "deposit account" or what the parties understood by the term "deposit account" is not material given the breadth of this Security Agreement.  Mr. Kearney pledged much more than just deposit accounts; he pledged "all assets and rights of the Pledgor, wherever located, whether now owned or hereafter acquired or arising ... accounts, ... deposit accounts, ... rights, ... or rights to payment of money..." (Doc. 815-18 at 2).  Further, the failure to specify which assets or rights were included in the pledge does not render it ambiguous.[13]  Nor

---

[13]Indeed, Mr. Kearney's accountant Justin Rowlson agrees that the IRA is a "retirement account" or a "right to a payment of money."  (Doc. 802 at 99–100).

does the failure to specifically identify the IRA account or funds render the Security Agreement ambiguous.

Rather, Mr. Kearney argues that because it is unclear what the true intent of the parties was, the agreement is ambiguous and the Court must look to extrinsic evidence of their intent. This circular argument is unavailing. Mr. Kearney's bare assertion about what the parties intended does not suggest a latent ambiguity (particularly given that Mr. Kearney's statements about what he and Moose purportedly intended is contradicted by the record, addressed above). He points to no collateral matter or insufficiency in the contract that renders any term or provision ambiguous. Nor does he point to a term or provision that has more than one meaning. This is simply not a case where "a contract is rendered ambiguous by some collateral matter," *RX Solutions, Inc.*, 746 So. 2d at 476, or where extraneous circumstances have revealed an "insufficiency in the contract," *Hunt*, 381 So. 2d at 1197. By its plain and unambiguous terms, the broad language of the contract encompassed potential retirement accounts or funds, such as the account at issue here. Because I find no latent ambiguity in the Agreement, there is no bar to summary judgment on the matter of the parties' intent nor a need for the Court to look at additional extrinsic evidence of same.

Finally, I have considered the opinion of Justin Rowlson, Mr. Kearney's CPA (Doc. 821-1), and find that it too fails to create a genuine issue of material fact. His conclusions, framed as "expert opinion," are not helpful to the Court on this issue. Mr. Rowlson summarily asserts that the Security Agreement "is very detailed as to what accounts are encompassed in the agreement" but does not specifically mention the IRA account. *Id.* at 11. The fact that the Security Agreement does not specifically mention the IRA account is of no moment, given the

language of the Agreement itself. In addition, Mr. Rowlson relies on Mr. Reed's previously stricken affidavit for his conclusion that the parties did not intend that the funds be included in the pledge. *Id.* at 10–11. Mr. Reed's statements have been deemed inconsistent with prior sworn testimony and thus provide an insufficient basis for Mr. Rowlson's opinion on the parties' intent. As a result, Mr. Rowlson's opinions on this matter are entirely unsupported, do not bolster Mr. Kearney's position, and provide no basis to deny summary judgment.

In sum, I find Mr. Kearney has failed to present sufficient evidence to overcome Travelers' motion for summary judgment. By my consideration, for the reasons explained above, no genuine issue of material fact exists as to whether the "IRA" funds currently found in Account -1122 were encompassed and pledged by virtue of Mr. Kearney's Security Agreement with Moose. Because Mr. Kearney pledged such funds, they lost their tax-exempt status and do not fall within the protections of Florida's retirement funds exemption statute. Accordingly, I recommend that Travelers' motion for summary judgment on this issue be **granted** and that the district judge enter a ruling that Account -1122 is not exempt pursuant to Florida Statute § 222.21(2)(a).

## V.

Upon consideration, as set forth above, I **RECOMMEND** that:

(1) FTBB, LLC's Second Motion for Summary Judgment on Travelers' Second Writ of Garnishment of Bing Kearney's USAmeriBank IRA Account (Doc. 805) be **DENIED**;

(2) Bing Charles W. Kearney's Motion for Summary Judgment Finding IRA Funds Maintained in USAmeriBank Account Ending -1122 Exempt from Garnishment Pursuant to § 222.21, Florida Statutes (Doc. 811) be **DENIED**; and

(3) Travelers' Motion for Final Summary Judgment in Garnishment as to the IRA Account (Doc. 815) be **GRANTED in part and DENIED in part** as described above.

Respectfully submitted this
16th day of August 2017.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies furnished to:
The Honorable James S. Moody, United States District Judge
Counsel of record